Case number 18-1112 et al. Breckenridge Pharmaceutical Inc. et al. Petitioners v. Food and Drug Administration et al. Ms. Reines for the petitioners and Ms. Carroll for the respondents. Thank you. May it please the Court. At stake on this appeal is a prescription system for the laxative PEG that encourages roughly a million patients a month to be treated for longer use of a laxative with the benefit of a doctor's supervision. And everyone has agreed that this has been as safe and efficacious a system as it is. The legal problem with the FDA decision-making here is its categorical refusal to even consider whether differences in duration of use can be a meaningful safety-based distinction. Can you take it week by week? Sure. For the second week, at least assuming that you just follow directions, a doctor's prescription is necessary, consultations necessary, right? Yes. Okay. So then we have the first week. Right. And your argument has to be that there's a significant contradiction with the FDA's original approval of an OTC version, that the risks of use are materially great, so great in that first week that allowing people to use it without a prescription has a serious safety issue, right? No. That has to be your argument. I don't believe that's the argument. I'm not sure it's the argument you make, but it seems to me it has to be your argument. The argument that we make, which I think is very straightforward and is undisputed, is that there is a serious risk during a second week of use that there would be safety problems. That's the definition of a prescription drug. Is there a problem about the second week of use? The two drugs are substantially identical. That assumes you get the second week by going to your doctor. Now, with the prescription, you get the first week, too, by going to your doctor. The fallacy of that, at least from our perspective, respectfully, is that all patients, no matter how infirm or addicted, are going to adhere to notices on a small bottle. If that were true, we wouldn't need prescriptions at all, because your hypothetical assumes that everyone after a week is going to terminate use and see a doctor. The role of the prescription is to make sure that someone is sufficiently qualified to adhere to the matters, but the assumption of a dual system, OTC and prescription, is that users are capable of adhering to instructions. If that premise is completely false, the whole system falls apart. Everything should be prescription. No, I don't agree with that. Except for drugs that you can just take without limits. One distinction here is that there's a unique circumstance, idiosyncratic to this particular situation, of masking. I understand the masking completely, but no one is suggesting we're going to. There could obviously be masking in those first few days, but back in 2008 or 2009, the FDA determined that the risk of that masking in the first seven days was insufficient to require a prescription. As long as it was limited to over-the-counter for seven days, right? So everybody agrees that any use for 14 days is something that requires doctor supervision. And I think the premise is that everybody, no matter how infirm under this fact pattern, can be presumed conclusively to be adhering to what the label states. And I just don't understand. You have to assume that they're adhering to the OTC label. Otherwise, what's the point of your argument? The OTC argument label says use no more than seven days. If they're actually using it as long as they want, then they wouldn't have any need for the prescription drug. Except that we know that's counterfactual because we have a million patients, roughly, a month. So are you telling me that they are reading the OTC label? I'm saying that doctors are advising people that want to use for more than a week, that they should get a prescription and be under doctor supervision. That seems perfectly. Do you believe that they are reading the label? If you pick up the Miralax OTC, which says use no more than seven days. Right. Do you think they stop at the end of seven days? That's what I'm asking. I think in some situations they will, in some situations they won't. It's been unstudied. There's so many questions here that are worthy of study. Because I don't believe that's as rigid as saying let's assume everybody adheres to the notice. What we have here is the FDA has stated time and again, five different times, that there's a safety-based need to have a seven-day limit on over-the-counter. And here, right, and so that has been stated that 14 days is not a safe period. That's the definition of a prescription drug. Well, I mean, there are risks associated with the extra week sufficient to justify the judgment of the FDA requirement of doctor supervision. Everybody agrees with that. But what's overlooked here is the rule that's being applied. The meaningful difference test states that the prescription product is safe only under the supervision of a licensed practitioner. And so, I mean, to assume that. You're not challenging the previous decision to go from Rx to OTC on Miralax, are you? Not at all. Okay. So their determination there that there was no safety need to maintain that drug with a prescription, you're not challenging that, right? That's correct. So now it can go to OTC and people either follow the instructions or not, but there's not a safety concern. There's not a safety concern assuming that people are using it for a week, which generally you hope they are. But that doesn't mean that in the context of people going to a doctor that say, I am a user that requires 14 days. Well, I understand if the argument were this was some drug that will kill you at the end of seven days. And they had, if you had that circumstance, FDA would never have allowed it to go to OTC. But here they've sent it to OTC believing that it would not cause a safety or health concern, and they specifically say that. And in this case, they have every other element of what a drug means, bioequivalence, physical chemistry, dosage level, et cetera, et cetera, population. And the only thing is labeling. And they explain that the labeling actually is just an artifact of the way in which they want, in the past they wanted all OTCs to be labeled the same. It wasn't because this particular drug had to be in a certain way. It was because for confusion purposes they wanted them to be the same. That's their explanation. Now, you may not like that explanation, and you can certainly challenge that explanation as arbitrary and capricious, but it doesn't seem like that's a reasonable claim that it's not the same drug. I think that's, I think it's just important for me to address that, which is it's an internally inconsistent position. At times they clearly say it's safety-based, which I thought we had agreed to earlier. And at times they say it's disconsistency. And the question of whether or not. Can I just, before you go. Oh, sure, I'm sorry. It seems to me that what the FDA was talking about is minor aspects of the wording of the instruction were chosen in order to fit the treatment of other over-the-counter laxatives. And so they went with that, with this. But the basic proposition that it was safe to use for a week was, I think, I mean, you've said it's undisputed. You've said you're not disputing the decision to allow a prescription at the OTC form of this. But the minor, if what's being assumed is that minor is this seven-day limitation, it's not minor. In 85 they said it's safety-based. Oh, it's unrelated. Minor, major, whatever. But that's what the standard is, is the meaningful difference test. Really the only function in the prescription thing is that the first week is coming in as a sort of orphan dragged along with the second week. The second week is what justifies the requirement of the prescription. The evidence that we submitted is that hospitalizations tripled, deaths doubled after it went over-the-counter. So the question isn't whether the over-the-counter should be withdrawn. It's whether we want to remove a system where a million prescriptions a month are being given by doctors and we have doctors. I mean, if all those deaths and so forth could be traced to the availability for one week. Right. And then those people would think it should be withdrawn. Well, let's look at it. I mean, I'm hearing skepticism. None of this has been looked at. Before we turn this massive system on its head and throw it out the door, let's have some look at these questions. Presumptively assuming that there's no problem because it says seven days and stop is inconsistent with the fact that doctors are giving a million prescriptions a month out because they believe that's the right way that people should be under doctor supervision. And the only, what I'm hearing is that even though it's a meaningful difference because it's safety-based, which everyone agrees is 7 v. 14 safety-based. That's why the FDA refused to give 14 days to the over-the-counter. Right? Everyone agrees that's a safety-based distinction. It meets the standard. This isn't some, all I'm hearing is that we're assuming that after seven days everyone's going to stop. So what's the difference? Right? That's the argument. And I just do not think in as complex a system like this with the infirm people, addicted people that are going to doctors and being under doctor supervision and saying, okay, maybe you need to be in an opioid detox rather than taking this week after week, throwing that all out just because we assume as a matter per se that people stop after a week just seems to me to be totally improper. When everyone agrees that there's a safety-based distinction, which meets exactly their standard. And one point I want to also note on the process is that in the notice in 2008, duration of use was specified as something that could be a distinction, a meaningful distinction. I think the character of that footnote is exceedingly confusing. Well, it says the manner in which a particular drug is dosed or administered, e.g., dose titration or duration of use, may also require clinical judgment and physician supervision and thus Rx status while a corresponding OTC version of the drug can be available at a different dosing regimen or duration of use does not require physician involvement. It's right in their own notice. So by the standard of everybody follows what the print on the bottle, you'd never have duration of use being a problem because you could always just say and use this way and go see a doctor. But let's get out of that artificial world and deal with the people that are getting doctor's help at a million a month so that people that have opioid and blockages for cancer and all this get the opportunity to get a doctor. Or at least let's have a hearing where we look at the things. All right. We're three minutes over. Let me just ask if any of the other judges have questions. Okay. Thank you very much. May it please the Court. Sarah Carroll on behalf of the government. FDA reasonably withdrew the approvals of petitioner's products, which, as Judge Garland noted, are identical to over-the-counter mural acts in every meaningful respect. They have the same approved indication. They have the same safety and efficacy profiles. They're the same in all these other ways. Petitioners rely solely on minor differences in the product's labeling, which, again, Judge Garland correctly noted, originate from FDA's decision to promote consistency with its general longstanding. Just to clarify and make sure my understanding is correct, that consistency or whatever is, is it correct that an FDA's view that if this is used for more than a week, it's not that the PEG-350 or whatever it is itself, the mural acts itself, becomes more dangerous to use. It isn't addictive. It doesn't build up toxicity. It's that after a week, we don't trust the patient's self-diagnosis anymore? Is that the safety risk? That's how I understood it. I think that's basically right, Judge Millett. I think the public health determination FDA has made is that, essentially, if people have these symptoms for seven days and haven't gotten relief from an over-the-counter product, there might be some underlying serious condition, and the person should see a doctor to see if, you know, it is something like that. So there's nothing in, apart from that you should no longer self-diagnose, there's nothing harmful about taking the mural acts itself for more than a week, other than you may be treating the wrong, you may be mistreating yourself, but the ingredient, the active ingredient itself does not become more harmful over time? I believe the record supports that, yes. I know that the over-the-counter... What if it did? I mean, because it sounded like you adopted sort of a categorical rule here, but then there's that footnote, and surely there are certain drugs that if used for a short time are perfectly fine, but over a longer period of time can build up either addictive qualities just based on the duration of use or a buildup of toxicity in the system. So I was somewhat confused about what sounded like a very categorical approach to duration of use here, which seemed to be somewhat inconsistent with prior FDA statements and with scientific reality. What are we to do with that? Contrary to petitioner's assertion, FDA has not taken a categorical view that duration of use can never create a meaningful difference. FDA explained in the order that it hasn't previously found duration of use standing alone to be a meaningful difference, and it said at JA673 that it was declining to find in this proceeding that duration of use standing alone was a meaningful difference. And that, of course, makes perfect sense because the asserted difference here is so small. But FDA has not foreclosed the possibility that there could be some different case, like Your Honor was hypothesizing, where perhaps duration could be more meaningful. And what is the difference between duration of therapy, which has been listed as a meaningful difference, and duration of use? I just couldn't figure that out. So I agree with Judge Williams that that footnote is not a model of clarity. Everywhere else in the record, FDA has made clear that it considers different factors in looking to what constitutes a meaningful difference. And then in that footnote is the – No, no. Is duration of therapy and duration of use, are they the same thing? I frankly do not know if duration of therapy is different from duration of use. But the reason I don't know that is because none of the examples that FDA cited in that footnote or elsewhere relied on either duration of use or duration of therapy standing alone to find a meaningful difference. So I frankly don't know exactly what that reference in the footnote meant, but it doesn't matter because even if duration of use or duration of therapy, whether they're the same or different, could hypothetically somewhere be enough standing alone to create a meaningful difference? It certainly doesn't here. Can we go to the reasons for the label on the OTC product? FDA says more than once that it's because of the previous labeling of that OTC product. But there's no indication anywhere that that meant the FDA was sacrificing safety in allowing one week without a patient seeing a doctor, right? No, that's right. In terms of materiality, whatever the nuances of wording were, the fundamental decision way back in 2008 was that a week was okay. Yes, that's absolutely right, Your Honor. A week was okay, but there was no need to have the impediment of having to see a doctor first. Right, that's right. And in view especially of FDA's determination that Miralax is effective within less than a week, perhaps three or four days to treat occasional constipation, which is the only indication that either the prescription or the over-the-counter product is indicated for, it made perfect sense to adhere to FDA's longstanding policy suggesting that people see a doctor after seven days. I'm happy to answer any other questions that the Court might have. Are you claiming Chevron deference here? I didn't see it argued in your brief at all. Right. So we did not honestly take petitioners to have challenged the standard that FDA has applied. They said in their reply brief that they had, and to the extent that they are doing that, certainly Chevron would apply. This is FDA's interpretation of the statute it administers. In fact, the petitions don't challenge your use of 355E3. That said second E3. Right. The most puzzling number in the statute, it seems, in any way. Except for the one in the last case. There are a lot of puzzling numbers today. That's right. That's right, Your Honor. Thank you. Thank you. Any time left? All right. We'll give you another minute. Thank you, Your Honor. With the admission that duration of use is not an absolute bar and that you have to evaluate particular circumstances, with Judge Millay hammered on the nose, there needs to be an evaluation as to whether or not people are following the label and whether there's safety and efficacy issues. If it really is case by case, as that was just established in that last questioning, then there should be an examination. At A424 and 426 is the adverse events documentation that shows that the hospitalizations have doubled, tripled, and the deaths have doubled. And there's a load of information about who's following what, which populations are doing what. And there's so much to consider. The focus in your new data is overwhelmingly on prolonged use. No. I think that we put an adverse events database in with analysis. We put a survey in that shows which people are using it in what way. None of this has been explored. This is an important enough topic to at least look at it since it's case by case on duration of use. Thank you. You've been very patient. Just one minor, not minor, actually important, but one thing before I leave. First of all, we appreciate very much the Court expediting the oral argument. We know you're busy in the busy day, manifestly. And then also, if there's any question about whether or not this statute is going to be upheld or not, we would ask for a stay pending the November 2nd date so that we don't turn this whole big system upside down and then have to clean it up. But it's not a one size fits all. It should be evaluated based on a hearing. Thank you very much. Thank you. The Court's going to stay in session to swear in one more new member of the power of the Court.
judges: Garland, Millett, Williams